**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

| | |
|---|---|
| Access Management Co, LLC, Mirra Health Care, LLC, Access Health Care Physicians, LLC, Access Healthcare of Tampa Bay, LLC, Brooksville Rehab 2000, Inc., West Hernando Diagnostic and MR Center, Inc., and Allied Healthcare, LLC,<br><br>　　　　　　Plaintiffs,<br><br>　　　－ against －<br><br>UnitedHealth Group, Inc., Optum, Inc., Optum Insight, Change Healthcare Inc., Change Healthcare Solutions, LLC, Change Healthcare Technologies, LLC, and Change Healthcare Operations, LLC,<br>　　　　　　　　　Defendants. | Case No. _____<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Access Management Co, LLC, Mirra Health Care, LLC, Access Health Care Physicians, LLC, Access Healthcare of Tampa Bay, LLC, Brooksville Rehab 2000, Inc., West Hernando Diagnostic and MR Center, Inc., and Allied Healthcare, LLC (together, "Access Healthcare," or "Plaintiffs") by and through counsel hereby file this Complaint against Defendants UnitedHealth Group Inc. ("UHG"), Optum, Inc. ("Optum"), Optum Insight, Change Healthcare Inc., Change Healthcare Solutions, LLC, Change Healthcare Technologies, LLC, and Change Healthcare Operations, LLC (Change entities together, known as "Change Healthcare") and all collectively as "Defendants" for damages caused by Defendants' failure to provide claim processing services to Access Healthcare.

**<u>INTRODUCTION</u>**

1.     In February 2024, Defendant Change Healthcare Inc. experienced a cybersecurity attack that put millions of patients' personal healthcare data at risk and froze claims processing for

millions of medical claims.  As a result of the data breach, Change Healthcare stopped providing services to Access Healthcare, instantly cutting off its ability to process millions of dollars in medical claims and threatening the financial stability of a major Florida healthcare provider with over 200 providers, 1,200 employees, and 89 locations around the state.

2.      What followed was not a transparent crisis response, but a calculated campaign of deception.  For months, Change Healthcare knowingly misled Access Healthcare about the true extent of the catastrophic system failure, repeatedly promising that services would resume "within days" or "by the end of the week" when its executives knew—or should have known—that their entire claims processing infrastructure had been fundamentally compromised with no viable path to restoration.

3.      Change Healthcare's false claims were not innocent mistakes or overly optimistic projections.  To the contrary, Change Healthcare knowingly and systematically misled Access Healthcare with false assurances, while Access Healthcare's claims backlog swelled to over 10,000 unprocessed submissions, cash flow dried up, and quality metrics tied to critical funding plummeted.  By March 2024, at the same time it was assuring Access Healthcare that it was a "priority partner" at the "very top of the list" for solutions, Change Healthcare failed to deliver any functional solutions.

4.      The consequences were devastating to Access Healthcare and entirely preventable. Had Change Healthcare been truthful about its inability to restore services, Access Healthcare could and would have pivoted to alternative clearinghouse solutions much sooner, thereby mitigating months of operational paralysis.  Instead, given Change Healthcare's false assurances of imminent restoration, Access Healthcare made the reasonable business decision to wait for that restoration in reliance on Change Healthcare's representations rather than undertake the massive

operational disruption of switching clearinghouses mid-crisis.

5.      The claims processing failure directly caused Access Healthcare's HEDIS quality scores to plummet, triggering automatic funding reductions from major payors.  Access Healthcare lost $969,417 in HEDIS bonuses due to inability to submit 2023 dates of service claims before the May 2024 deadline.  WellCare, one of Access Healthcare's major funders, reduced Access Healthcare's funding by $209,668 annually as a result of Access Healthcare's decreased HEDIS score.  Access Healthcare's quality metrics, which determine millions in annual funding, were decimated not by any failure in patient care, but solely because Change Healthcare's system failure prevented timely claims submission.

6.      Change Healthcare's failures forced Access Healthcare into crisis mode for ten months.  Thousands of staff hours were diverted from patient care to manual claims processing. Executive leadership spent countless hours in futile communications with Defendants' representatives who became increasingly unresponsive.  Access Healthcare was forced to secure emergency financing to meet payroll and operational expenses while awaiting payment for services already rendered.[1]

7.      The deception continued even after the initial crisis.  When Change Healthcare finally acknowledged it could not restore services, it promoted its "Optum Intelligent EDI" platform as a temporary solution, claiming it was "continuously running and processing" throughout the incident.  This too was false.  The Optum Intelligent EDI system required manual claim uploads by individual payers, lacked basic functionality like claims tracking, and proved so inadequate that Access Healthcare had no choice but to seek an entirely new clearinghouse vendor.

---

[1]      Its patients faced collection actions and credit damage because their insurance claims sat unprocessed in Change Healthcare's failed systems.

8.      By the time Access Healthcare achieved full functionality with a new clearinghouse in December 2024—ten months after the catastrophic failure of Change Healthcare's systems—irreversible damage had been done.  Access Healthcare suffered lost revenues, decreased quality scores and funding, terminated patient relationships, and reputational harm that will take years to repair.  All of this could have been avoided had the breach not occurred in the first place, but it would further have been avoided had Change Healthcare been honest about the severity of the breach its ability to correct the issue.

9.      This lawsuit seeks accountability for Change Healthcare's dual failures: first, the grossly negligent security practices that enabled a foreseeable ransomware attack on systems housing millions of patient records and billions in medical claims; and second, the deliberate decision to mislead customers about the severity of the breach rather than allow clients to protect themselves through alternative arrangements.

## PARTIES, JURISDICTION, AND VENUE

10.      Plaintiff Access Management Co., LLC ("Access Management") is a Florida limited liability company with its principal place of business at 14690 Spring Hill Drive, Spring Hill, Florida 34609.  Access Management is a wholly-owned subsidiary of Mirra-Auro Holdings, LLC and serves as the management company for all healthcare entities within the Mirra-Auro enterprise.

11.      Plaintiff Mirra Health Care, LLC ("Mirra") is a Florida limited liability company with a principal place of business at 14690 Spring Hill Drive, Spring Hill, Florida 34609.  Mirra is a wholly-owned subsidiary of Mirra-PrimeAccess Holdings, LLC and operates as a third-party administrator providing claims adjudication, customer service, appeals, billing, utilization management, credentialing, and healthcare technology services for the entire Mirra-Auro

enterprise.

12.    Plaintiff Access Health Care Physicians, LLC ("AHCP") is a Florida limited liability company and subsidiary of Mirra-Auro Holdings, LLC, managed by Access Management Co., LLC.  AHCP is a physicians group with over 200 healthcare providers across 89 locations throughout Florida.  Specifically, and as relevant to this action, Access Health Care Physicians, LLC also operates and does business as ("d/b/a") as Advanced Cancer Treatment Centers. Advanced Cancer Treatment Centers operates from Brooksville, Florida and provides comprehensive oncology services including medical oncology, hematology, radiation oncology, and infusion services.  In 2024, AHCP acquired Phoenix American Medical, LLC a Florida limited liability company with its principal place of business in Spring Hill, Florida, and additional practice locations in Tampa, Brooksville, and Port Richey.  Phoenix American Medical operated as a community health center providing internal medicine, primary care, wellness, and dental services, and now those assets are within the AHCP umbrella.

13.    Plaintiff Access Healthcare of Tampa Bay, LLC is a Florida limited liability company operating as a hospitalist group in Spring Hill, Florida, with 21 healthcare professionals working from 2 practice offices.

14.    Plaintiff West Hernando Diagnostic and MR Center, Inc. is a Florida corporation with its principal place of business in Spring Hill, Florida.  This entity provides diagnostic imaging and MRI services, and falls within the Access Healthcare umbrella.

15.    Plaintiff Brooksville Rehab 2000, Inc. is a Florida corporation with its principal place of business in Brooksville, Florida.  Brooksville Rehab provides rehabilitations and physical therapy services.

16.    Plaintiff Allied Healthcare, LLC ("Allied") is a Florida limited liability company

in which MPA Holdings (part of Mirra-PrimeAccess Holdings, LLC) maintains a 50% ownership interest, with the remaining 50% held by Vipul Shah and Mohammad Ibrahim. Allied is managed by Access Management Co., LLC and operates as a hospitalist group specializing in inpatient care services, maintaining its principal place of business in Spring Hill, Florida.

17.    Defendant UnitedHealth Group Incorporated ("United" or "UHG") is a Delaware corporation with a principal place of business at 9900 Bren Road East, Hopkins, Minnesota 55343-9664.

18.    Defendant Optum, Inc. ("Optum") is a Delaware corporation with a principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota 55344. Optum is a wholly-owned subsidiary of UHG.

19.    Defendant Optum Insight, Inc. is a Delaware corporation with a principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota 55344. Optum Insight is a wholly-owned subsidiary of UHG.

20.    Defendant Change Healthcare Inc. is a Delaware corporation with a principal place of business at 424 Church Street, Suite 1400, Nashville, Tennessee 37219. Change Healthcare Inc. is a wholly-owned subsidiary of Optum.

21.    Defendant Change Healthcare Operations, LLC ("CHO") is a Delaware corporation with a principal place of business at 424 Church Street, Suite 1400, Nashville, Tennessee 37219. CHO is a wholly-owned subsidiary of Optum.

22.    Defendant Change Healthcare Solutions, LLC ("CHS") is a Delaware corporation with a principal place of business at 424 Church Street, Suite 1400, Nashville, Tennessee 37219. CHS is a wholly-owned subsidiary of Optum.

23.    Defendant Change Healthcare Technologies, LLC ("CHT") is a Delaware

corporation with a principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota 55344.  CHT is a wholly-owned subsidiary of Optum.

24.    On information and belief, Defendants work together to provide services and communicate with customers, therefore they are referred to throughout the Complaint collectively as Change Healthcare or Defendants.

25.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as Plaintiffs are of diverse citizenship from Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to the Plaintiffs' claims took place within this District and Defendants conduct business in this District.

## FACTUAL ALLEGATIONS

### A.    The Parties' Business Relationship

*Access Healthcare's Operations and Reliance on Claims Processing*

27.    Plaintiffs are all part of the Mirra-Auro Holdings enterprise, which provides integrated healthcare services throughout Florida with over 200 healthcare providers, 1,200 employees, and 89 locations under unified management by Access Management Co., LLC.

28.    Access Healthcare relies on electronic claims processing services to receive timely payment for the medical services it renders to patients.

29.    The timely processing of claims is essential to Access Healthcare's business operations, cash flow, and ability to provide continuous patient care.

*Change Healthcare's Role as Claims Processor*

30.    Change Healthcare, through its acquisition of Access Healthcare's prior claims

processing vendors, assumed contractual obligations to provide electronic claims processing services to Access Healthcare.

31.    The relationship started on January 7, 2014 with Change Healthcare's previous entity Envoy LLC ("Emdeon"). Emdeon served as Access Healthcare's healthcare clearinghouse, which is an intermediary between providers and payers. As its healthcare clearinghouse, Emdeon received claims from providers, standardized and validated the information, and transmitted those claims for adjudication and reimbursement. In doing so, it facilitated the reimbursement process by ensuring claims were accepted and payments were processed efficiently.

32.    In 2018, the parties entered into an addendum whereby Change Healthcare would take over for Emdeon in the Agreement.

33.    On May 15, 2020, the parties further memorialized their relationship through a Master Relationship Agreement, in which Change Healthcare positioned itself as an indispensable link in the healthcare reimbursement process, serving as the clearinghouse that enabled Access Healthcare to submit claims electronically to insurance payers.

34.    Change Healthcare provided its services to Access Healthcare through multiple Electronic Health Record (EHR) systems, specifically eClinicalWorks (ECW) platforms and Mirra Gateway (Gateway).

35.    As of February 2024, Access Healthcare connected to Change Healthcare for claims processing through the following ECW databases: Access Main (Tampa Bay), Allied Hospitalist Group (serving Allied Healthcare's hospitalist services), Compassionate Group, MAS Healthcare, Access Secondary ECW, and Allied Post Acute.

**B.    The February 2024 Cyberattack**

36.    On or about February 21, 2024, Change Healthcare suffered a ransomware

cyberattack that compromised its systems nationwide.

37.     Although Defendants never properly notified Access Healthcare about facts related to the breach, Access Healthcare has since learned details about what took place from public disclosures in other lawsuits related to the data breach.

38.     According to these disclosures, on or about February 11, 2024, the username and password for a low-level, customer support employee's access to Change Healthcare's Citrix portal (the "Portal") were posted in a Telegram group chat that advertises the sale of stolen credentials.

39.     The Portal was a virtual desktop, where the employee could access the Change Healthcare's applications (as permitted by Change Healthcare) needed to perform his or her job responsibilities.   The account was a basic, user-level account: it only had access to specific applications and did not have administrator access or credentials.

40.     On February 12, 2024, a hacker accessed the Portal via the username and password shared on the Telegram group chat, thus gaining entry to the basic, user-level account.  From that limited account, the hacker was able to break into the server that hosted Change Healthcare's medication management application, SelectRX.

41.     This access to systems critical to Change Healthcare's operations—by a user-level account—went undetected by Defendants until the hacker revealed itself, after it began to encrypt Change Healthcare's systems over a week later, locking Change Healthcare out of those systems.

42.     From there, the hacker created privileged accounts with administrator capabilities that permitted access to and deletion of any and all files, changes to system configurations, and similar administrator-level activities.  These actions went to the heart of the integrity of Change Healthcare's most critical IT infrastructure, but still went undetected by Defendants.

43.     Over the next nine days, the hacker navigated through Change Healthcare's systems and servers at will, installing multiple malware tools and applications, as well as a number of "backdoors" that would allow the hacker to return to those environments in the event Change Healthcare detected the suspicious activity and tried to block access.

44.     The hacker continued to access the systems undetected and unimpeded.  The hacker copied and exfiltrated terabytes of personal identifying information, financial account information, and protected health information for tens of millions of individuals, including Social Security numbers, driver's licenses, state ID numbers, passport numbers, health insurance information (such as primary, secondary or other health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers), health information (such as medical record numbers, providers, diagnoses, medicines, test results, images, care and treatment), and/or billing, claims and payment information (such as claim numbers, account numbers, billing codes, payment cards, financial and banking information, payments made, and balance due). These acts, too, went undetected until the hacker revealed itself.

***Access Healthcare Finally Learns of the Attack***

45.     It was not until February 21, 2024, when the hacker deployed ransomware on Change Healthcare's systems causing outages and disruptions, that Defendants purportedly became aware of a cybersecurity threat to Change Healthcare's systems.

46.     That day, in response, Defendants took Change Healthcare's systems offline.  That is, the hacker's infiltration of Change Healthcare's systems was so severe that Change Healthcare's only response was to shut down its primary *and* secondary systems.

47.     Defendants misled Access Healthcare about the nature of the breach.  Instead of admitting that their systems had been hacked, Defendants told Access Healthcare that their systems were down for maintenance, but would be back up shortly.

48.     On or about February 23, 2024, Defendants again misled Access Healthcare, stating that the *reason* the systems were shut down was for "updates" that would continue through the weekend.  Defendants knew this was untrue.

49.     On or about February 26, 2024, the ransomware group BlackCat/ALPHV ("BlackCat") claimed responsibility for the attack.  Change Healthcare later confirmed that BlackCat had represented itself as responsible for the attack and had claimed to have stolen terabytes of data.

50.     On or about March 3, 2024, UHG made a bitcoin ransom payment to BlackCat of approximately $22 million.

51.     The payment of the ransom, however, did not bring Change Healthcare's systems back online or mitigate the harm done.  Because Change Healthcare was unable to check every system and interface for backdoors, and because Change Healthcare's backup systems were also compromised, Change Healthcare was unable to repair its systems.  Instead, Change Healthcare opted to rebuild its systems from the ground up because its redundancy systems were inadequate.

52.     Had Defendants implemented proper security measures, the data breach—and resulting harm—would not have occurred.  As of February of 2024, Change Healthcare did not have systems, policies, and practices in place appropriate to secure and protect the volume and highly sensitive nature of the data being handled, including Access Healthcare's data.

53.     Upon information and belief, Defendants were aware that Change Healthcare maintained outdated and highly-vulnerable systems.  For instance, as UHG's CEO testified to

Congress, aspects of Change Healthcare's legacy systems used to process claims and payments were *up to 40 years old*. UHG's CEO also revealed that Change Healthcare stored most of its data on physical servers, rather than cloud-based servers, which were less secure and lacked appropriate segmentation to take into account the sensitivity of the data at issue.

54.     Among the outdated features of Change Healthcare's systems was the lack of multi-factor authentication, a security feature that requires a user to provide multiple, independent pieces of evidence to authenticate their identify and gain access to a system.

55.     Once Change Healthcare's system was infiltrated, the hacker was able to disable both the primary and backup systems because the backup systems were not isolated from the primary and few elements were stored on the cloud, both of which are basic security features. Moreover, Change Healthcare's redundancies were also affected, inadequate, or both, thereby preventing the backup and redundancy systems from being effectively used to mitigate the damage from the breach.

56.     Similarly, the lack of segmented systems, which are common to cloud-based servers, allowed the hacker to travel among Change Healthcare's systems freely—compromising multiple systems which Change Healthcare was unable to recover—and ultimately resulting in the complete shutdown of Change Healthcare's operations.

57.     These failures demonstrate Defendants' breach of its obligations to "safeguard [Access Healthcare] Confidential Information with . . . no less than reasonable care" and "implement industry standard security measures in order to secure the Products and Services."

58.     The Security Breach also caused Access Healthcare severe reputational harm among payors and providers. At least one provider informed Access Healthcare that, because of the lack of data, it would not accept any more Access Healthcare claims until it could consistently

present more accurate information.

59.     As a result of the cyberattack, Change Healthcare immediately ceased all claims processing services, cutting off Access Healthcare's ability to submit claims or receive electronic remittance advice (ERA).

60.     February 21, 2024 was the last date Access Healthcare was able to successfully transmit claims or receive ERA postings through the affected Change Healthcare systems.

61.     On February 23, 2024, Change Healthcare notified Access Healthcare that it was "experiencing a cyber security issue" and was "working to address the matter."

62.     In this initial communication, Change Healthcare represented that (i) the disruption was "expected to last at least throughout the day," (ii) there was a "high level of confidence that [UHG] Group systems ha[d] not been affected by this issue" and (iii) it had "disconnected [its] system to prevent further impact."

63.     Change Healthcare provided no indication that the breach had compromised its ability to fulfill its contractual obligations or that the outage would extend for months.

**C.     Change Healthcare's Pattern of Misrepresentations**

*False Promises of Quick Resolution*

64.     Between February 2024 and April 2024, Change Healthcare engaged in a pattern of misrepresentations regarding the timeline for service restoration.

65.     Change Healthcare repeatedly minimized the severity of the outage and provided false assurances about imminent restoration, including:

    a.   February 21, 2024: "Resolution is estimated to continue through today"

    b.   February 22, 2024: "We expect resolution efforts will extend through tomorrow"

    c.   February 23, 2024: "The disruption is expected to last at least through the day"

    d.   March 6, 2024: "Data center will be stood up by the end of the week. This is great progress"

    e.   March 11, 2024: Ed Laughman, Access's Chief Information Security Officer, was told Change Healthcare was "still targeted to go back online by March 18th"

    f.   March 13, 2024: Testing was "beginning next week" on "restarting the clearinghouse"

    g.   March 18, 2024: Change Healthcare claimed it would "begin testing and reestablish connectivity"

***Inducement to Wait Rather Than Seek Alternatives***

66.    On March 4, 2024, Change Healthcare told Access Healthcare it was "very focused" on finding workaround solutions and that "Access is a priority partner on our list."

67.    On March 5, 2024, Change Healthcare stated "We have Access at the very top of the list for a technical discussion and migration to [the alternative claims processing service]."

68.    On March 11, 2024, when asked about the process of re-enrolling with Change Healthcare after restoration, Change Healthcare represented there would be "no need" to move enrollments back, suggesting a simple transition.

69.    These representations were designed to and did induce Access Healthcare to wait for Change Healthcare's restoration rather than immediately pursuing alternative clearinghouse solutions.  During conference calls with DataMarshall (Access Healthcare's billing vendor) and other stakeholders, Access Healthcare related its decision not to send paper claims or manually transmit through an alternate system called Availity based on Change Healthcare's "short

turnaround time promises."

70.     By April 4, 2024, Access Healthcare's EMR team leader Mary Bowermaster was still unable to get clear guidance from Change Healthcare regarding restoration timelines.

***Proposed Interim Solutions That Failed***

71.     In early March 2024, Change Healthcare promoted alternative Optum services as a temporary solution, claiming these services "were not impacted and have been continuously running and processing . . . through this incident."

72.     Change Healthcare directed Access Healthcare to register for "Optum Intelligent EDI" (iEDI) as an interim solution.

73.     The Optum iEDI solution proved inadequate as it:

   a.   required manual export of claim batches from ECW by individual payer

   b.   required manual upload of each batch, making it impractical for Access Healthcare's volume of over 10,000 claims

   c.   did not provide automated claims status tracking - claims would need to be "manually tracked once sent"

   d.   was less user friendly than alternative services considered by Access Healthcare

   e.   did not offer the full functionality that was Change Healthcare promised on its conference calls

74.     As time progressed, Change Healthcare became less communicative, and representatives repeatedly failed to respond to response to inquiries by Access Healthcare.

## D.     Access Healthcare's Reliance and Resulting Damages

***Decision Not to Immediately Switch Clearinghouses***

75.     Based on Change Healthcare's representations about short turnaround times,

Access Healthcare and its stakeholders determined with DataMarshall (its billing vendor) that it was better for Access Healthcare's business for Access Healthcare to await Change Healthcare's promised forthcoming solutions than to switch to paper claims or manual transmission through alternative clearinghouses.

76.     Had Access Healthcare known the true extent of the outage and that Change Healthcare would not restore services for months, however, it would have immediately pursued alternative clearinghouse arrangements.

***Accumulation of Unprocessed Claims***

77.     As a result of Change Healthcare's cessation of services, Access Healthcare accumulated a massive backlog of unprocessed claims.

78.     By April 2024, the Mirra-Auro enterprise had accumulated 52,984 unprocessed claims totaling $15,127,660 across its entities that could not be transmitted through Change Healthcare's failed systems.

79.     Change Healthcare's inability to process claims created an immediate cash flow crisis for Access Healthcare, as Access Healthcare could not receive payment for services already rendered to patients.

***Failed Attempts at Alternative Solutions***

80.     When Change Healthcare's promised quick resolution failed to materialize, Access Healthcare attempted to use Optum iEDI platform that Change Healthcare encouraged Access Healthcare to use.

81.     Access Healthcare set up Optum EDI accounts but ultimately discovered that the system required manual batch exports by payer and manual uploads, making it impractical for the volume of claims Access Healthcare needed to process.

**E.**      **The Decision to Switch Clearinghouses**

***Recognition of Change Healthcare's Inability to Perform***

82.      By April 2024, it was abundantly clear that Change Healthcare's repeated promises of imminent restoration were false and that the company could not provide a reliable timeline for service restoration.

83.      Change Healthcare's representatives became less communicative and failed to respond to multiple follow-up inquiries from Access Healthcare's leadership.

84.      On March 27, 2024, UHG posted an update claiming "Medical claims are flowing through Change Healthcare's network," which Access Healthcare knew to be false based on its own inability to process any claims.

***Migration to Waystar***

85.      In May 2024, after months of waiting for Change Healthcare's restoration, Access Healthcare made the decision to contract with Waystar for clearinghouse services.

86.      Access Healthcare entered into a contract with Waystar in May 2024 and began implementation in June 2024.

87.      The migration to Waystar required:

a.  Processing nine workbooks for each of Access Healthcare's healthcare practices

b.  Setting up new Waystar configurations

c.  Re-enrolling with all 199 payers

d.  Mapping EMRs with vendors

e.  Testing claim batches for each entity

f.  Waiting for government payer approval windows of 45 days

88.   Due to the overwhelming number of healthcare providers fleeing Change Healthcare, Waystar was backlogged with new accounts, creating significant delays in implementation.

89.   Full functionality with Waystar was not achieved until December 2024, approximately 10 months after Change Healthcare's initial failure.

**F. Damages Suffered by Access Healthcare**

*Revenue and Related Losses*

90.   Access Healthcare lost critical cash flow for the approximately 10 months that it was unable to process claims for services already rendered.  The enterprise accumulated 52,984 claims totaling $15,127,660 that could not be processed through Change Healthcare's failed systems.   Specific entities suffered documented losses from timely filing denials totaling $1,279,361.

   a.   Access Healthcare of Tampa Bay was unable to process 18,400 claims totaling $3,950,887.  It suffered $86,124 in timely filing denials due to being unable to transmit commercial claims for 155 days, and Medicare claims for 272 days.

   b.   Allied Healthcare was unable to process 27,866 claims totaling $5,423,320.  It suffered $334,610 in timely filing denials due to being unable to transmit commercial claims for 204 days, and Medicare claims for 357 days.

   c.   West Hernando Diagnostic and MR Center, Inc. was unable to process 6,718 claims totaling $5,753,453, and suffered  $858,627 in timely filing denials.

91.   The inability to submit claims timely devastated Access Healthcare's quality scores:

   a.   Access Healthcare suffered $969,417 in lost HEDIS bonuses.

      b.   Access Healthcare suffered a $209,668 annual reduction in WellCare funding (a 0.5% decrease in their yearly funding from this organization).

      c.   And the HEDIS quality score rating reductions negatively impacted future funding and quality-based contract reimbursements.

92.    As a managed care provider, Access Healthcare incurred nearly $18 million in delayed funding, but most notably Aetna and CarePlus terminated their agreements resulting in a monthly capitalization loss of nearly a million dollars per month.

      a.   The loss of the 1700 members in Aetna and CarePlus has resulted in over four million dollars in lost revenue through August 2025.

93.    As a result, Access Healthcare was forced to secure alternative financing to maintain operations, pay interest charges on borrowed funds at inflated rates due to its cash position, and issue credits to clients.

94.    The restoration timeline varied dramatically by entity and system: including by plaintiff and by insurer.  Advanced Cancer Treatment Centers achieved the fastest recovery, establishing alternative processing through the Unlimited Systems/Availity clearinghouse by March 1, 2024, filing 1,514 claims totaling $4,198,373.62.  However, other AHCP entities remained paralyzed for significantly longer.

95.    Access Healthcare of Tampa Bay was able to establish commercial claims processing July 25, 2024 (after 155 days), and Medicare claims processing November 19, 2024 (after 272 days).

96.    Allied Healthcare established commercial claims processing September 12, 2024 (after 204 days), and Medicare claims processing February 12, 2025 (after 357 days).

97.    West Hernando Diagnostic and MR Center, Inc. established commercial claims

processing August 8, 2024 (after 169 days), and Medicare claims processing February 11, 2025 (after 356 days).

98.     Access Healthcare has implemented cost-cutting measures to mitigate these losses including reduction of nearly 350 staff members including providers, clinic and operations employees.  Access has also consolidated and closed locations, incurred legal expenses and had to undergo further financial testing by their lender due to their inability to make payments.

99.     Multiple Access Healthcare patients permanently discontinued services because Change Healthcare's failure to process insurance claims resulted in patients receiving direct bills for amounts that should have been covered by insurance.  When claims cannot be processed, providers must bill patients directly, leading to collection actions that damage patient trust and relationships.  This forced patients to seek care elsewhere despite Access Healthcare's attempts to work with them during the crisis.

100.     As a result of the prolonged outage, Access Healthcare lost several large institutional clients including skilled nursing facilities and healthcare partners who depend on timely reimbursement for their own operations.

### Operational Disruption and Costs

101.     Access Healthcare diverted tens of thousands of staff hours from normal business operations to address the crisis created by Change Healthcare's failure.

102.     Access Healthcare incurred substantial costs for additional labor to manually process claims attempts, implement the new Waystar clearinghouse system, re-enroll with payers, and test and validate new claims processing pathways.  Access Healthcare additionally had to increase internal security monitoring due to an increase risk of spillover threats caused by the Change Healthcare cyberattack.

*Lost Business and Reputational Harm*

103.    Access Healthcare suffered reputational damage within the healthcare community as a provider unable to process claims timely, despite the failure being entirely attributable to Change Healthcare.

*Ongoing Impact*

104.    Even after partial restoration of services, Access Healthcare continued to experience problems with claim batches and processing errors that persisted beyond July 2024.

105.    The migration to a new clearinghouse required permanent changes to Access Healthcare's operations and workflows, creating ongoing costs and inefficiencies.

106.    To this day, Access Healthcare continues to work through the backlog of claims from the outage period, with ongoing risks of timely filing denials and payment delays.

## FIRST CAUSE OF ACTION

### (Common Law Negligence)

107.    Access Healthcare hereby realleges and incorporates all previous allegations.

108.    At relevant times, Change Healthcare set up, provided, managed, maintained, operated, supervised, controlled, and commercially benefited from a network, equipment, and systems ("System") used to operate Change Healthcare's claims processing platform ("the Change Platform") and offer claims handling services ("Services") to Access Healthcare.

109.    Change Healthcare owed Access Healthcare a duty to exercise reasonable care in setting up, providing, managing, maintaining, operating, supervising, and controlling the System, including a duty to secure the System against reasonably foreseeable breaches of the System, to have adequate training and policies to secure the System against reasonably foreseeable ransomware attacks, to warn Access Healthcare (directly or through Change Healthcare's vendors)

of gaps or deficiencies in the System, to monitor the System for attacks, to timely notify Access Healthcare (directly or through Change Healthcare's vendors) of attacks, and to ensure that the Services would be properly functioning, timely, and accurate, including by having redundancies and contingency plans in the event of an attack on the System.

110.    Change Healthcare also owed Access Healthcare a duty to exercise reasonable care to avoid harm to Access Healthcare because it was a reasonably foreseeable and probable victim of Change Healthcare's substandard cybersecurity practices, such as a lack of MFA, given that Change Healthcare's System houses the Services such that it was reasonably foreseeable that, if an attack on the System caused the System to be disconnected (as happened here), Access Healthcare would be injured by the sudden and sustained lack of claims and payment processing by the Change Platform.

111.    Defendants knew or should have known of the vulnerabilities of their System and of the significance of their inadequate security measures, including the reasonably foreseeable harm to Access Healthcare from a System breach and disconnection.  Defendants knew or should have known about the prevalence of ransomware attacks and data breaches in the healthcare sector. And Defendants knew or should have known that their network security did not adequately safeguard the Services.

112.    Defendants' duty to use reasonable care in securing and operating the System so as to protect against disconnection of the Change Platform also arises from the parties' relationship, as well as common law and federal law, and Defendants' own policies and promises regarding privacy and data security.

113.    Defendants breached their duties to Access Healthcare numerous ways through their affirmative misfeasance, including, among other ways, by:

a. Creating, using, and implementing security systems, protocols, and practices that were insufficient to protect the System against reasonably foreseeable ransomware attacks;

b. Creating, using, and implementing systems, protocols, and practices that lacked redundancies and contingency protocols and were otherwise insufficient to ensure the continuity of the Change Platform and avoid sudden and sustained lack of claims and payment processing in the event of a breach of the System;

c. Creating, using, and implementing security systems, protocols, and practices that violated regulatory requirements and industry standard data security measures for the healthcare industry leading up to the Ransomware Attack;

d. Failing to comply with their own privacy and data security policies;

e. Failing to adequately monitor, evaluate, and ensure the security of the System;

f. Failing to have reasonably adequate contingency plans and backup systems to avoid sudden and sustained lack of claims and payment processing by the Change Platform; and

g. Failing to warn Access Healthcare (directly or through Change Healthcare's vendors) that the System was not adequately secured and/or that a reasonably foreseeable breach of the System could require disconnection and sudden and sustained loss of Services through the Change Platform.

114.    Access Healthcare would have been able to timely submit claims and receive timely payment for its healthcare services but for Defendants' wrongful and negligent breaches of their duties.

115.    It was reasonably foreseeable to Defendants that a breach of the System could injure

Access Healthcare, whose claims and payments for healthcare services were routinely processed both directly by and through the Change Platform and Access Healthcare reasonably relies on the timely and accurate processing of such claims and payments.

116.    As a direct and proximate result of Defendants' negligence, Access Healthcare has been injured and is entitled to damages in an amount to be proven at trial.  Access Healthcare's damages include at least the following: missed payments for their healthcare services; delayed payments for their healthcare services; bonuses lost as a result of decrease claims processing metrics; funding lost due to a decrease in Access Healthcare's HEDIS score; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

117.    Defendants' breaches of one or more of their duties was a substantial factor in causing harms, injuries, and damages to Access Healthcare.

118.    Defendants' conduct, as described above, was willful, wanton, reckless, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct and warrants an award of punitive damages in an amount sufficient to punish the Defendants and deter others from like conduct.

## SECOND CAUSE OF ACTION

### (Negligence Per Se)

119.    Access Healthcare hereby realleges and incorporates all previous allegations.

120.    At all relevant times, each Defendant had an obligation to comply with applicable statutes and regulations, including Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1) and HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

121.    Section 5 of the FTC prohibits "unfair . . . practices in or affecting commerce."  The FTC has interpreted Section 5 to include as an unfair act or practice the failure by a business to employ reasonable security measures to secure access to their paid-for systems, despite representing otherwise.

122.    The HIPAA Privacy and Security Rules require, *inter alia*, that Defendants maintain adequate data security systems to reduce the risk of data breaches and cyberattacks, adequately protect the PHI of patients, and ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted.  *See, e.g.*, 45 C.F.R. § 164.306(a)(1).

123.    Defendants violated Section 5 of the FTCA and HIPAA Privacy and Security Rules by failing to use reasonable security measures to secure access to their paid-for Change Platform, despite representing otherwise, including by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of sensitive information they collect, maintain, and/or transfer as well as the nature of the Change Platform's

business.  Defendants' conduct was also unreasonable given the foreseeable consequences of a System breach to the continuity of the Services (given Defendants' lack of redundancies and contingency plans) and the resulting impact on Access Healthcare, as described above.

124.    Defendants' violation of Section 5 of the FTCA and the HIPAA Privacy and Security Rules constitutes negligence per se.

125.    Plaintiffs are within the class of persons that Section 5 of the FTCA and HIPAA Privacy and Security Rules were intended to protect.

126.    The harm suffered by Access Healthcare as a result of the Ransomware Attack is the type of harm that Section 5 of the FTCA and HIPAA Privacy and Security Rules were intended to guard against.

127.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in securing the System would result in harm to Plaintiffs due to not being able to timely submit claims for and not receiving timely payments for their healthcare services.

128.    The injury and harm that Plaintiffs suffered was the direct and proximate result of Defendants' violation of Section 5 of FTCA and HIPAA Privacy and Security Rules.

129.    Access Healthcare has been injured and is entitled to damages in an amount to be proven at trial.  Access Healthcare's damages include at least the following: missed payments for their healthcare services; delayed payments for their healthcare services; bonuses lost as a result of decrease claims processing metrics; funding lost due to a decrease in Access Healthcare's HEDIS score; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new

healthcare payment software and systems; expenses associated with time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

130.    Defendants' conduct, as described above, was willful, wanton, reckless, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct and warrants an award of punitive damages in an amount sufficient to punish the Defendants and deter others from like conduct.

## THIRD CAUSE OF ACTION

## (Interference With Prospective Economic Advantage, Business Relationship, Or Expectancy)

131.    Access Healthcare hereby realleges and incorporates all previous allegations.

132.    At the time of the cyberattack and outage, Access Healthcare had ongoing business relationships or business expectancies with its patient base and with third party claims processors who relied on Change Healthcare to process claims.  Access Healthcare submitted claims through the Change Platform (directly and through third-party claims processors) with the expectation and understanding that these claims would be processed and reimbursed in a timely fashion.

133.    Defendants knew or should have known about these relationships or expectancies due to the intentional integration of the Change Platform and the Services and processes with the third parties and their data systems.  Indeed, the Change Platform is an indispensable link in the healthcare reimbursement process, enabling Access Healthcare and its customers to conduct business transactions, process claims, and exchange payments.  Access Healthcare relied on Defendants to ensure it could run and grow successful businesses.

134.    Despite Defendants positioning the Change Platform as a linchpin of the nation's healthcare system and crucial to Access Healthcare's healthcare business operations, Defendants (1) failed to implement reasonable and adequate security controls to prevent the cyberattack; (2) shut down the Change Platform without an adequate substitute in place to ensure that Access Healthcare could be paid for the vital health services it performed; and (3) failed to have adequate business continuity or disaster recovery plans and capabilities to quickly recover the Systems.

135.    Defendants failed to act with reasonable care and intentionally engaged in wrongful conduct, including by violating Section 5 of FTCA and HIPAA Privacy and Security Rules. Defendants had ample knowledge of the requirements to implement reasonable data security under the FTCA and HIPAA, and knew of the increased risk to healthcare entities, as well as many recent high profile cybersecurity incidents at other healthcare companies.

136.    As a result of Defendants' intentional and wrongful conduct, Defendants interfered with and disrupted the business relationships or expectancies between Plaintiffs and the patients who rely on Plaintiffs' services, as well as business relationships or expectancies between Plaintiffs and the third-party claims processors that Plaintiffs contract with who ultimately submitted claims through the Change Platform.

137.    Defendants knew that interference with Access Healthcare's business relationships and expectancies was substantially certain to occur as a result of the cyberattack and shutdown.

138.    Defendants did not have any privilege or justification for their actions, and they were strangers to the business relationships between Access Healthcare and the third parties with which they interfered.

139.    As a direct and proximate cause of Defendants' wrongful conduct, Access Healthcare has suffered damages as discussed herein, including loss of the ability to obtain

prospective economic advantages from existing business relationships. Access Healthcare was unable to obtain payment for services rendered as a result of the Defendants' interference, and was unable to maintain promising business relationships with both patients and with third-party claims processing service providers.

140.    Access Healthcare has been injured and is entitled to damages in an amount to be proven at trial. Access Healthcare's damages include at least the following: missed payments for their healthcare services; delayed payments for their healthcare services; bonuses lost as a result of decrease claims processing metrics; funding lost due to a decrease in Access Healthcare's HEDIS score; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

## FOURTH CAUSE OF ACTION

### (Fraudulent Inducement)

141.    Access Healthcare hereby realleges and incorporates all previous allegations.

142.    As alleged in greater detail above, Change Healthcare made numerous representations regarding the supposed secure nature of the Services and that they complied with federal regulations, including FTCA and HIPAA. Such representations were false because the

System lacked adequate data privacy practices, which rendered the Services unsecure and led to the cyberattack and shutdown.

143.    Change Healthcare failed to comply with industry standard controls, such as NIST CSK and CIS controls, that Access Healthcare rigorously follows.  Change Healthcare attested to Access Healthcare, via HITRUST certification, that Change Healthcare was upholding these standard security protocols across the board.

144.    Such representations were material to Access Healthcare who reasonably relied on Change Healthcare's representations (1) when maintaining contracts with Change Healthcare (after Access Healthcare's former claims processor Emdeon purchased and rebranded as Change Healthcare in 2016) based on Change Healthcare's false representations that the Services were secure and complied with federal regulations, and (2) in continuing to rely on Change Healthcare after the cyberattack and shutdown based on Change Healthcare's false assurances that Services would be rapidly restored.

145.    Access Healthcare would not have contracted with Change Healthcare to use the Services had it known they were not as secure as represented (or secure by any reasonable standard) and failed to comply with federal regulations.  Access Healthcare would not have maintained its contracts with Change Healthcare as long as it did after the cyberattack and shutdown had it known the actual effects of the attack on Change Healthcare's Systems.

146.    Defendants intended for Access Healthcare to rely and Access Healthcare did rely on Defendants' representations before, during, and after the cyberattack and shutdown.

147.    Access Healthcare has been injured and is entitled to damages in an amount to be proven at trial.  Access Healthcare's damages include at least the following: missed payments for their healthcare services; delayed payments for their healthcare services; bonuses lost as a result

of decrease claims processing metrics; funding lost due to a decrease in Access Healthcare's HEDIS score; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

**FIFTH CAUSE OF ACTION**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act Fla. Stat. §§ 501.201, _et seq._ )**

148.    Access Healthcare hereby realleges and incorporates all previous allegations.

149.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

150.    Defendants engaged in deceptive practices by making representations, omissions, or using practices that are likely to mislead a consumer acting reasonably under the circumstances, to the consumer's detriment, including but not limited to the following:

    a.    Prior to the shutdown, Defendants knowingly and willingly misrepresented, through statements and omissions, that their network maintained adequate protections and maintained data in a HIPAA-compliant manner to induce Plaintiffs to use and rely on Defendants' services.  Plaintiffs' decision to trust

Defendants with its processing needs was based on Defendants' statements that Defendants would take adequate security precautions and maintain industry standard cybersecurity measures, and omissions that Defendants maintained weak data security that failed to comply with the law.

b. During the shutdown, Defendants knowingly and willingly misrepresented, through statements and omissions, the extent and impact of the shutdown. Defendants did so with the intent to deceive Plaintiffs into believing that the Change Platform would return to functionality quickly.

151.    Defendants engaged in unfair practices that offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, including but not limited to the following:

a. Defendants violated Section 5 of the FTCA, which prohibits "unfair . . . practices in or affecting commerce," including as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable security measures to ensure access to their paid-for Change Platform, despite representing otherwise.

b. Defendants also violated HIPAA Privacy and Security Rules by failing to use reasonable security measures to ensure access to their paid-for Change Platform, despite representing otherwise, by not complying with applicable industry standards.

152.    An objectively reasonably person would have been deceived by Defendants' deceptive and unfair practices.

153.    Access Healthcare has suffered actual damages.  As a direct and proximate cause

of Defendants' wrongful conduct, Access Healthcare has suffered damages including at least the following: missed payments for its healthcare services; delayed payments for its healthcare services; bonuses lost as a result of decrease claims processing metrics; funding lost due to a decrease in Access Healthcare's HEDIS score; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

154.    Access Healthcare's damages are a result of Defendants' actions:

a.    But for Defendants' failure to employ reasonable security measures, in violation of the law, and despite representing otherwise, the Change Platform would not have been shut down, and Plaintiffs would not have suffered injuries and incurred damages.

b.    But for Defendants' misleading statements and omissions regarding the efficacy of Defendants' security measures, Plaintiffs would not have relied on Defendants for their clearinghouse services and would not have suffered injuries and incurred damages.

c.    But for Defendants' misleading statements and omissions regarding the

duration and extent of the shutdown, Plaintiffs would not have incurred additional costs associated with mitigating the damage caused by Defendants.

## SIXTH CAUSE OF ACTION

## (Breach of Contract against Change Healthcare Inc., Change Healthcare Solutions, LLC, Change Healthcare Technologies, LLC, and Change Healthcare Operations, LLC ("Change")).

155.    Plaintiffs hereby realleges and incorporates all previous allegations.

156.    As explained above, Access Healthcare and Change, by and through its subsidiaries, executed several business agreements between 2014 and 2020, Plaintiffs and their predecessor entities executed multiple business agreements with Change and its predecessors (including Emdeon) for clearinghouse and claims processing services (the "Contracts").  Access Healthcare has complied with all material terms of the Contracts.

157.    Most notably, in the MRA, Change agreed to "protect and safeguard [Access Healthcare's] Confidential Information with at least the same care used for its own Confidential Information of a similar nature, but no less than reasonable care."

158.    In doing so, Change agreed to a reasonable care standard to maintain Access Healthcare's Confidential Information.

159.    Change repeatedly failed to perform under the Contracts, including by failing to maintain adequate security measures to safeguard Access Healthcare's Confidential Information, and by failing to take adopt industry standards for the safeguarding of private information—which resulted in the Ransomware Attack and the loss of Access Healthcare's information—and by subsequently failing to notify Access Healthcare of the Security Breach, Change Healthcare breached, the Contracts.

160.     Additionally, Change's inability to perform under the MRA and other Agreements based on its own negligent security measures led to Access Healthcare's inability to obtain full payment on countless claims as a direct result of failures to perform under the Contracts.

161.     By failing to perform its contractual obligations, Change has breached at least the following provisions of the Contracts:

    a.   The duty to maintain adequate security measures including multi-factor authentication

    b.    The duty to provide continuous claims processing services

    c.   The duty to maintain business continuity and disaster recovery capabilities

    d.   The duty to promptly notify Access Healthcare of service disruption

    e.   The implied covenant to maintain industry-standard cybersecurity practices

162.     In addition, Change did not implement industry standard security measures or exercise reasonable care to protect and safeguard Access Healthcare's confidential information.

163.     Instead, Defendants lied to Access Healthcare, informing them that the systems were "down," but would be back up shortly, which was untrue.

164.     As described above, Access Healthcare has lost valuable customer and transaction information as result of Change's breaches of contract, and has been damaged by these breaches in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing against Change )

165.     Plaintiffs hereby realleges and incorporates all previous allegations.

166.     Access Healthcare and Change executed several business agreements between 2014 and 2024, known collectively as the Contracts.

167.    A covenant of good faith and fair dealing inheres in every contract under Georgia law, including the Contracts between Access Healthcare and Change.

168.    By engaging in the acts alleged herein, Change has breached its duty of good faith and fair dealing, by among other things, falsifying records and failing to submit claims, by submitting claims to the wrong party, by failing to update the security systems to prevent the Security Breach, and by failing to properly notify Access Healthcare of the Security Breach.

169.    Access Healthcare has been damaged by Change's breach of the covenant of good faith and fair dealing in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

A.    That judgment be entered for Plaintiffs against Defendants for all general, compensatory, punitive, and liquidated damages in an amount to be proven at trial;

B.    That Plaintiffs be awarded all attorneys' fees and costs it has, and will, incur in connection with this action, pursuant to the provisions of the parties' agreements, and/or any applicable law;

C.    That Plaintiffs be awarded all available statutory damages, prejudgment and post-judgment interests, as applicable, at the highest lawful rate; and

D.    For an award of such other relief the Court deems appropriate.

DATED this 30th day of September, 2025.

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

*/s/ Pranav Lokin*

Pranav Lokin (Florida Bar # 1061168)
1200 Abernathy Road NE
Building 600, Suite 1500
Atlanta, GA 30328
pranavlokin@quinnemanuel.com
Telephone: (404) 482 3502
Facsimile: (404) 681 8290

Robin McGrath (pro hac vice incoming)
robinmcgrath@quinnemanuel.com
1200 Abernathy Road NE
Building 600, Suite 1500
Atlanta, GA 30328

Rajat Rana (pro hac vice incoming)
295 5th Avenue, 9th Floor
New York, New York 10016
rajatrana@quinnemanuel.com

Daniel Albert-Rozenberg (pro hac vice incoming)
111 Huntington Ave, Suite 520
Boston, MA 02199
Telephone: (617) 712 7100
Facsimile: (617) 712 7200

*Attorneys for Plaintiffs Access Healthcare*
